AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



United States of America

v.

LUIS MIGUEL AGUINAGA CHAVEZ, JORGE
GARRIDO ANCONA, CHRISTIAN MARCIAL
MORAN MATUS, ALONSO SABAD ARROYO
ROJAS, and RAYMUNDO MORALES
BARRIOS,

Defendants

Case No.   2:21-mj-02306-duty

**FILED**
CLERK, U.S. DISTRICT COURT

MAY 10 2021

CENTRAL DISTRICT OF CALIFORNIA
BY:            IB            DEPUTY

**LODGED**
CLERK, U.S. DISTRICT COURT

5/10/2021

CENTRAL DISTRICT OF CALIFORNIA
BY:            D            DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of May 8, 2021 in the county of Los Angeles in the Central District of California, the

defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Eric Selfridge*
*Complainant's signature*

_____
Eric Selfridge, HSI Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:            5/10/2021

_____
*Judge's signature*

City and state:   Los Angeles, California

Hon. Alexander F. MacKinnon, U.S. Magistrate
Judge
_____
*Printed name and title*

**AFFIDAVIT**

I, Eric Selfridge, being duly sworn, declare and state as follows:

**I.  PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint and arrest warrants against Luis MIGUEL AGUINAGA CHAVEZ ("AGUINAGA CHAVEZ"), Jorge GARRIDO ANCONA ("GARRIDO ANCONA"), Christian Marcial MORAN MATUS ("MORAN MATUS"), Alonso Sabad ARROYO ROJAS ("ARROYO ROJAS"), and Raymundo MORALES BARRIOS ("MORALES BARRIOS"), for violation of 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a Controlled Substance.

2.   This affidavit is also made in support of an application for a warrant to search the following digital devices in the custody of Homeland Security Investigation, in Commerce, California, (collectively, the "SUBJECT DEVICES") as described more fully in Attachment A:

a.   SUBJECT DEVICE 1: one black Apple iPhone, Model A1661, recovered from 167 Townsend, Los Angeles, California (the "Townsend House," as described more fully below);

b.   SUBJECT DEVICE 2: one Samsung Phone with IMEI 351767115145814, recovered from the Townsend House;

c.   SUBJECT DEVICE 3: one Samsung Phone with IMEI 351767114756108, recovered from the Townsend House;

d.   SUBJECT DEVICE 4: one Samsung Phone, Model SMA107M, recovered from GARRIDO ANCONA;

e.    SUBJECT DEVICE 5: one Apple iPhone with phone case bearing writing in large cursive letters, with an unknown IMEI, recovered from the Townsend House;

f.    SUBJECT DEVICE 6: one LG Phone with IMEI 352411-43-030972-7, recovered from the Townsend House;

g.    SUBJECT DEVICE 7: one Motorola Model XT2043-4 with IMEI 355539118362704, recovered from the Townsend House;

h.    SUBJECT DEVICE 8: one gold colored Apple iPhone 12 with IMEI 19350408487780539, recovered from the Townsend House;

i.    SUBJECT DEVICE 9: one LG Phone with IMEI 355041617907477, recovered from the Townsend House;

j.    SUBJECT DEVICE 10: one Samsung phone with IMEI 351767114814865, recovered from the Townsend House;

k.    SUBJECT DEVICE 11: one Samsung phone with IMEI 3517671142486, recovered from the Townsend House;

l.    SUBJECT DEVICE 12: one Samsung phone with IMEI 351767115486689, recovered from the Townsend House;

m.    SUBJECT DEVICE 13: one Samsung phone with IMEI 351767114724577, recovered from the Townsend House;

n.    SUBJECT DEVICE 14: one Apple iPhone with an unknown IMEI number, recovered from AGUINAGA CHAVEZ;

o.    SUBJECT DEVICE 15: one LG phone with IMEI 355041619526234, recovered from AGUINAGA CHAVEZ;

p.    SUBJECT DEVICE 16: one black Apple iPhone in a blue case with an unknown IMEI number, recovered during a traffic stop of ARROYO ROJAS and MORALES BARRIOS; and

q.    SUBJECT DEVICE 17: one blue Apple iPhone with an
unknown IMEI number, recovered during the traffic stop of ARROYO
ROJAS and MORALES BARRIOS.

3.    The requested search warrant seeks authorization to
seize evidence, fruits, or instrumentalities of violations of 21
U.S.C. §§ 846, 841(a)(1) (conspiracy, distribution, and
possession with intent to distribute controlled substances) (the
"Subject Offense"), as described more fully in Attachment B.
Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested complaint, arrest
warrants, and search warrant, and does not purport to set forth
all of my knowledge of or investigation into this matter.
Unless specifically indicated otherwise, all conversations and
statements described in this affidavit are related in substance
and in part only.

## II. BACKGROUND OF AFFIANT

5.    I am a Special Agent ("SA") with Homeland Security
Investigations, and have been so employed since September 2018.
In April 2019, I completed the Criminal Investigator Training
Program and Homeland Security Investigations SA Training at the
Federal Law Enforcement Training Center.  I am currently
assigned as a SA with the Los Angeles Interagency Metropolitan
Police Apprehension Crime Task Force ("LA IMPACT").  Prior to my

employment by the Department of Homeland Security, I was
employed as a Deputy Sheriff by the Sheriff of Arlington County,
Virginia, for approximately two years.

6.    During the course of my employment as a law
enforcement officer, I have received training regarding laws
pertaining to arrest, search and seizure, and evidence
collection.  I have also gained practical experience making
arrests, conducting searches and seizures, and collecting
evidence.  Between my employment by the Department of Homeland
Security and the Arlington County Sheriff's Office, I have
received over one year of academy training, and over one year of
formalized field training.

7.    Additionally, I have had hundreds of hours of formal
and informal training in a wide variety of investigative and
other law enforcement subjects, including mobile surveillance
and narcotics sales and trafficking investigations.  I have
received numerous hours of instruction from SAs and detectives
at LA IMPACT regarding narcotics packaging, sales,
transportation, and usage.  I have received training from court
qualified experts in the fields of criminal investigations and
narcotics-related investigations.

8.    During the course of my employment, I have received
specialized training in the fields of criminal investigation by
attending numerous courses in criminal law, criminal
investigation, narcotics investigation and laws of arrest.  I
have attended a one-day surveillance class, which included
mobile and static surveillance.  The class also covered counter-

surveillance tactics utilized by criminals.  I have conducted
covert surveillance on residences and subjects that are
suspected of selling narcotics.

9.   I have assisted in serving search warrants for the
Department of Homeland Security, the Federal Bureau of
Investigation, the California Department of Justice, several
local police departments, and LA IMPACT, in connection with
investigations regarding narcotics, weapons, and various other
offenses.  I have had specialized training and field experiences
in violations dealing with heroin, cocaine, amphetamines,
cannabis, depressants, prescription medication, and other
dangerous drugs.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

10.  On May 6, 2021, Customs and Border Protection ("CBP")
officers and Homeland Security Investigations ("HSI") agents
identified a tractor trailer at the Otay Mesa Point of Entry
that contained a white powdery substance that field tested
positive for cocaine.  The driver identified the address of a
warehouse (located at 2640 E Washington Blvd, Los Angeles,
California, Unit #25 ("Warehouse 25")) in Los Angeles as the
intended destination.  Over the following days, in conducting
surveillance of Warehouse 25, law enforcement officers
identified multiple individuals who visited the warehouse and
traveled in vehicles from the warehouse to a house in Southeast
Los Angeles, including AGUINAGA CHAVEZ, GARRIDO ANCONA, MORAN
MATUS, ARROYO ROJAS, and MORALES BARRIOS.  Law enforcement
officers obtained and executed state search warrants for

Warehouse 25  and the Townsend House, and recovered
approximately 2483.68 pounds of crystalline substance that field
tested positive for methamphetamine, a total of approximately
198.08 kilograms of white powdery substance that field tested
positive for cocaine.

    11.  AGUINAGA CHAVEZ, GARRIDO ANCONA, and MORAN MATUS, were
present at the execution of the search warrant at the Townsend
House, where large quantities of drugs were present in plain
sight.  ARROYO ROJAS and MORALES BARRIOS were seen present at
the Townsend House, were followed by law enforcement as they
left the Townsend House prior to execution of the warrant, and
detained during a traffic stop while the search warrants were
executed.

    12.  The seventeen SUBJECT DEVICES were seized from the
Townsend House, defendants, and a vehicle, as discussed below.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

    13.  Based on my review of law enforcement reports, my
conversations with other law enforcement agents, and my own
knowledge of the investigation, I am aware of the following:

   **A.   HSI INVESTIGATORS IDENTIFY A TRACTOR TRAILER
         CONTAINING BEETS AND COCAINE AT THE OTAY MESA PORT OF
         ENTRY**

    14.  On May 6, 2021, HSI investigators at the Otay Mesa
United States Port of Entry identified a tractor trailer that
contained a shipment of the vegetable beets.  This vehicle was
stopped and searched pursuant to CBP border search policies.
CBP Agent Omar Zavala conducted a search of the cargo and

discovered a solid substance co-mingled with the beets that
field tested positive for cocaine.

15.   Law enforcement interviewed and questioned the driver,
who provided the address of the destination of the delivery as a
warehouse located at 2640 E Washington Blvd, Los Angeles,
California, Unit #25 (Warehouse 25).  Law enforcement agents
then rode in the truck with the driver to conduct a controlled
delivery of the cargo to Warehouse 25.[1]  Other law enforcement
officers set up surveillance outside of Warehouse 25 in advance
of the delivery.

**B.   DELIVERY OF THE NARCOTICS TO WAREHOUSE 25**

16.   On May 7, 2021, at approximately 5:30 a.m., the truck
delivered the cargo to Warehouse 25.  During the offloading
process, a white Dodge Ram pickup truck bearing California
license plate 16221B1 (the "Ram") was parked near the warehouse.
Law enforcement officers saw the driver of the Ram assist with
offloading the cargo into Warehouse 25.  After the cargo was
unloaded, the Ram left, and law enforcement continued
surveillance of Warehouse 25.

17.   Later in the afternoon that same day, law enforcement
saw the Ram, occupied by three men, return to the warehouse.
All three men went inside Warehouse 25.  Shortly thereafter, a
white Ford van bearing California license plate 46664V1 (the

---

[1] Agents also covertly installed a tracking device in the
truck's cargo, as a safety precaution since law enforcement
officers would be travelling in the truck to conduct the
controlled delivery.  However, the tracking data was not
necessary for identification of the location of the warehouse,
since agents were physically riding in the truck, and the
address had been provided by the driver.

"Van"), with two additional men inside, arrived at the
warehouse.  The two men in the Van then got out of the Van and
walked toward Warehouse 25.  Both men from the Van were wearing
high visibility reflective vests.  One of the three men already
in Warehouse 25 walked out to greet the two men from the Van.
All three of these men then went into Warehouse 25.  The two men
from the Van later exited Warehouse 25 and got back into the
Van.  The roll up door to Warehouse 25 opened, and the driver of
the Van backed into Warehouse 25 such that the rear cargo area
of the Van was inside Warehouse 25.  Approximately ten minutes
later, the driver of the Van pulled out of Warehouse 25, and the
other four men got into the Van and the Ram, and both vehicles
drove away from Warehouse 25.

**C.   THE VEHICLES TRAVEL FROM WAREHOUSE 25 TO THE TOWNSEND
HOUSE**

18.  The Van, containing its original two occupants, and
the Ram, containing its original three occupants, drove in
tandem to a restaurant approximately one block away.  Both
vehicles were left in the parking lot unoccupied.  While the
five men were eating inside, Detective Marc Tarzia walked by the
Van and, in plain sight through the back window of the Van, saw
a box that appeared to contain beets.  Detective Tarzia was
unable to see if any contraband was hidden within this box of
beets.  Once the five men exited the restaurant, law enforcement
followed them to a single-family residence located at 167
Townsend Ave, Los Angeles, California (the "Townsend House"),
arriving at approximately 4:21 p.m.

19.   The Van pulled into the driveway and parked in an attached garage.  The Ram parked at the curb in front of the Townsend House.  All five men went into the Townsend House through the front door.  About ten minutes later, one of the men walked into the front yard and looked up and down the street as if he was checking to see if anyone was watching him or the Townsend House, and then he went back inside.  About twenty minutes later, all five men left the Townsend House through the front door.  Each man was carrying what appeared to be pillowcase-sized bags.  They each put the bags in the truck bed of the Ram, got into the Ram, and drove away from the Townsend House.

20.   Law enforcement followed the Ram as it traveled to a Ramada Hotel, located at 1089 Santa Anita Ave, in South El Monte, California.  While the five men got out of the Ram, a marked Los Angeles County Sheriff's vehicle drove into the hotel parking lot for what was believed to be an unrelated call for service and parked near the entrance of the hotel.  The five men appeared to take notice of the marked Los Angeles County Sheriff's vehicle and appeared to be hesitant to walk toward the entrance of the hotel.

21.   That evening, law enforcement obtained, from the Honorable Rubiya Nur, Los Angeles Superior Court Judge, a tracker warrant for the Ram and began tracking the vehicle.  Per the tracker activity, the Ram returned to the Townsend House around 8:39 p.m. for approximately 20 minutes and then went back to the Ramada Hotel where it remained until the following

morning.  Meanwhile, law enforcement continuously maintained
surveillance on Warehouse 25.

### D.   TARGETS MEET WITH SUSPECTED NARCOTICS BUYERS AT THE TOWNSEND HOUSE

22.   The following morning (May 8, 2021), law enforcement
reestablished surveillance at the Ramada Hotel.  At 7:50 a.m.,
the same five previously-surveilled men exited the hotel front
doors and got into the Ram.  The Ram traveled to a Denny's,
located off the 60 Freeway and Wilcox Ave in the City of
Montebello, California.  The Ram pulled into the rear parking
lot of the Denny's where a white Dodge Challenger was already
parked.  Two of the men got out of the Ram and got into the
Challenger.  Both the Ram and Challenger then drove in tandem to
the house around 8:25 a.m.  The Challenger parked in the garage,
and the Ram stayed in the driveway of the Townsend House for
several minutes before it was moved and parked down the street
from the house at the intersection of Michigan Avenue and
Townsend Avenue.

23.   Law enforcement ran the license plate on the
Challenger, which revealed that the Challenger was a rental car
registered to Avis Budget Group ("Avis").  Law enforcement
contacted Avis and learned that the Challenger was rented in
Phoenix, Arizona, on May 7, 2021, and was due back to Los
Angeles International Airport ("LAX") on May 8, 2021.

24.   At approximately 9:00 a.m., the Challenger left the
house in tandem with a blue Nissan Sentra bearing California
license plate 8JCM683 (the "Nissan"), which was parked in front

of the Townsend House.  Both vehicles drove to the Ross
Department Store parking lot, located at Wilcox Ave and the 60
Freeway in Montebello, California.  The occupants of the
Challenger spoke briefly with the occupants of the Nissan.  The
Challenger then drove away from the area, and law enforcement
followed the Challenger to Avis Car Rental at LAX.  The two men
that returned the Challenger to the rental service did not
return again to the Townsend House or Warehouse 25 and have not
yet been identified by law enforcement.  Law enforcement also
followed the Nissan.  The occupants of the Nissan went into the
Ross for approximately 20 minutes and then returned with what
appeared to be clothing items in Ross bags.  The Nissan then
travelled back to the Townsend House, where the clothing bags
were taken inside.

     25.  Based on my training and experience, specifically with
narcotics trafficking, I believe the subjects in the rented
Challenger were narcotics buyers.  I believe that these buyers
came to Los Angeles to test a sample of the narcotics which were
being stored at the Townsend House, and then left Los Angeles.

     **E.    TRAFFIC STOP**

     26.  At approximately 11:40 a.m. on May 8, 2021, prior to
execution of the search warrants described below, two of the
previously-surveilled men left the Townsend House in the Nissan.
They were followed by law enforcement and eventually traffic
stopped while travelling southbound on Interstate 5.  The
traffic stop was conducted by Officer Scott Kakuk, a K9 officer
for Culver City Police Department, for violations of California

Vehicle Code Section 26708(a).  The driver of the Nissan was
identified as ARROYO ROJAS, and the passenger as MORALES
BARRIOS.  ARROYO ROJAS and MORALES BARRIOS were detained pending
execution of the search warrants, and were later arrested
following the seizure of drugs described below.  Upon arrest,
MORALES BARRIOS had approximately $3,000 cash in his pocket.
SUBJECT DEVICES 16 and 17 were recovered from the Nissan.

> **F.    SEARCH OF THE TOWNSEND HOUSE AND SEIZURE OF
> APPROXIMATELY 2230.68 POUNDS OF METHAMPHETAMINE AND
> 198.08 KILOGRAMS OF COCAINE**

27.  On or about May 8, 2021, the Honorable Stacy Wiese,
Los Angeles Superior Court Judge, authorized warrants to search
Warehouse 25 and the Townsend House.

28.  Law enforcement executed the warrant to search the
Townsend House at approximately 12:57 p.m. on May 8, 2021.  When
agents knocked and announced, MORAN MATUS answered the door.
After the knock and announce, a helicopter saw GARRIDO ANCONA
attempting to flee from the back of the Townsend House.  GARRIDO
ANCONA was apprehended and detained and had possession of
SUBJECT DEVICE 4.  Law enforcement found A.S.C.R. walking down
the stairs toward the front door when agents entered the
Townsend House, and she was detained.  SUBJECT DEVICE 5 was
found on her person, and SUBJECT DEVICE 7 was found in a bag
with a Louis Vuitton receipt with A.S.C.R.'s name on it.  Law
enforcement heard a loud crack from the upstairs area of the
house, then saw AGUINAGA CHAVEZ come down the stairs.  AGUINAGA
CHAVEZ had suffered injuries to his hand in an apparent attempt
to destroy SUBJECT DEVICES 14 and 15, which were later found in

12

the Townsend House damaged with broken screens.  The remainder
of the SUBJECT DEVICES were found inside the Townsend House
during the search.

29.  The Townsend House was sparsely furnished and
decorated.  Inside the house, law enforcement found bulk amounts
of narcotics in plain sight.  Law enforcement seized
approximately 2230.68 pounds of methamphetamine, packaged in
pillowcase-sized bags, each weighing approximately 10-20 pounds;
and approximately 198.08 kilograms of cocaine packaged in
pressed bricks:

     a.  Inside the garage of the Townsend House, law
enforcement found 18 packages of methamphetamine, packaged in
pillowcase-sized bags, each weighing approximately 10-20 pounds,
and multiple beet boxes.  The Van was parked inside the garage.
Inside the Van, law enforcement found plastic wrappings matching
the boxes; plastic wrappings from the shipment and boxes later
found in Warehouse 25 (discussed below); and two high visibility
reflective vests, matching the ones worn by two of the men in
the Van at Warehouse 25 on the previous day.

     b.  Inside a storage area in the Townsend House, law
enforcement found 140 packages of cocaine and 94 packages of
methamphetamine.

     c.  In a downstairs bedroom in the Townsend House,
law enforcement recovered 31 packages of cocaine.

     d.  In an upstairs closet in the Townsend House, law
enforcement found 47 packages of methamphetamine.

30.  Law enforcement field tested the suspected narcotics on site, and the results came back positive for methamphetamine and cocaine.  In total, from the search of the Townsend House, law enforcement found and seized approximately 2230.68 pounds of methamphetamine and 198.08 kilograms of cocaine.

31.  Based on the significant amount of narcotics recovered at the Townsend House, the lack of significant furnishings or signs that the Townsend House was regularly inhabited, and based on my training and experience as a law enforcement officer, I believe the Townsend House to be a "stash pad" used by AGUINAGA CHAVEZ, GARRIDO ANCONA, MORAN MATUS, ARROYO ROJAS, and MORALES BARRIOS and other potential co-conspirators to receive, store, and prepare illegal drugs for further distribution.

**G.   SEARCH OF WAREHOUSE 25 AND SEIZURE OF ADDITIONAL 253 POUNDS OF METHAMPHETAMINE**

32.  Law enforcement executed the search warrant for Warehouse 25 at approximately 1:20 p.m. on May 8, 2021.  Keys recovered at the Townsend House were used to access the locked front door.  Law enforcement recovered bulk amounts of narcotics that were concealed within shipments of beets and wrapped in plastic wrap with images of beets.  Law enforcement recovered 18 bags containing 10-20 pounds of methamphetamine each, for a total of approximately 253 pounds of methamphetamine.  The suspected methamphetamine was field tested, and the results came back positive for methamphetamine.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG OFFENSES</u>

33.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.  Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds.  Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

c.  Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or

15

others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

d.   Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

e.   Individuals engaged in the illegal purchase or sale of drugs and other contraband often use multiple digital devices.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

34.   As used herein, the term "digital device" includes the SUBJECT DEVICES.

35.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary

directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence
related to a crime, the device's user, or the existence of
evidence in other locations, such as, how the device has been
used, what it has been used for, who has used it, and who has
been responsible for creating or maintaining records, documents,
programs, applications, and materials on the device.  That
evidence is often stored in logs and other artifacts that are
not kept in places where the user stores files, and in places
where the user may be unaware of them.  For example, recoverable
data can include evidence of deleted or edited files; recently
used tasks and processes; online nicknames and passwords in the
form of configuration data stored by browser, e-mail, and chat
programs; attachment of other devices; times the device was in
use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be
evidence of how the device was used, what it was used for, and
who used it.  For example, showing the absence of certain
software on a device may be necessary to rebut a claim that the
device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal
data by using encryption, steganography, or by using misleading
filenames and extensions.  Digital devices may also contain
"booby traps" that destroy or alter data if certain procedures
are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for
devices or data that cannot currently be decrypted.

36.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that it can take a substantial period of time to search a
digital device for many reasons, including the following:

a.  Digital data are particularly vulnerable to
inadvertent or intentional modification or destruction.  Thus,
often a controlled environment with specially trained personnel
may be necessary to maintain the integrity of and to conduct a
complete and accurate analysis of data on digital devices, which
may take substantial time, particularly as to the categories of
electronic evidence referenced above.

b.  Digital devices capable of storing multiple
gigabytes are now commonplace.  As an example of the amount of
data this equates to, one gigabyte can store close to 19,000
average file size (300kb) Word documents, or 614 photos with an
average size of 1.5MB.

c.  The large number of digital devices recovered and
the large number of involved individuals will significantly
increase the amount of time necessary to analyze all devices and
determine ownership of devices when possible.

d.  Many of the digital devices recovered appear to
be programmed for use in the Spanish Language, meaning that
their review will require investigators that are fluent in the
Spanish Language, as well as translators fluent in the Spanish

Language, which will significantly increase the amount of time necessary to review the devices.

e.   Two of the Subject Devices were already damaged by AGUINAGA CHAVEZ in his attempt to destroy evidence.  The process to recover evidence from these devices may require significant additional time and resources.  This attempted destruction of evidence also raises concerns of future attempts to remotely destroy or tamper with electronic evidence, which will necessitate the use of safeguards that may prolong the search process.

37.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when

a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know all of the passcodes of the devices likely to be found in the search.

   c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress AGUINAGA CHAVEZ's, GARRIDO ANCONA's, MORAN MATUS's, ARROYO ROJAS's, MORALES BARRIOS's, and A.S.C.R.s thumb- and/or fingers on the devices; and (2) hold the devices in front of AGUINAGA CHAVEZ's, GARRIDO ANCONA's, MORAN MATUS's, ARROYO ROJAS's, MORALES BARRIOS's, and A.S.C.R.'s face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

38. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

39. For all of the reasons described above, there is probable cause to believe that AGUINAGA CHAVEZ, GARRIDO ANCONA, MORAN MATUS, ARROYO ROJAS, and MORALES BARRIOS have violated 21 U.S.C. § 841(a)(1): Possession with Intent to Distribute a

20

Controlled Substance.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.


/s/
_____
Eric Selfridge, Special Agent
Homeland Security
Investigations


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this ____ day of
_____, 2021.

10th

May

_____
THE HONORABLE ALEXANDER F.
MACKINNON
UNITED STATES MAGISTRATE JUDGE

21